------------------------------------------------------------ X
                    :

GABRIEL HOYLE,                  :

                    :

               Petitioner,    :

                    :        MEMORANDUM

      - against -           :        <u>AND ORDER</u>

                    :

W. LAPE, Superintendent,      :        08-CV-4839 (JG)
Coxsackie Correctional Facility,   :

                    :

             Respondent.   :
------------------------------------------------------------ X

A P P E A R A N C E S :

       GABRIEL HOYLE
           05-A-0588
           Coxsackie Correctional Facility
           P.O. Box 999
           Coxsackie, NY 12051
           Petitioner, *pro se*

       CHARLES J. HYNES
           District Attorney
           Kings County
           125-01 Queens Boulevard
           Kew Gardens, NY 11415-1568
       By:   Linda Susan Breen
           Alyson Gill
           Attorneys for Respondent

JOHN GLEESON, United States District Judge:

           Gabriel Hoyle, a prisoner incarcerated in the Coxsackie Correctional Facility

pursuant to a judgment of the New York State Supreme Court, Kings County, petitions for a writ

of habeas corpus under 28 U.S.C. § 2254. Hoyle challenges his conviction following a jury trial

of one count of robbery in the first degree. Appearing *pro se*, Hoyle seeks habeas relief on the

grounds discussed below. Oral argument was held on March 27, 2009, at which Hoyle appeared

by videoconference from the facility in which he is serving his sentence. For the reasons set forth below, the petition is denied.

BACKGROUND

A.     The Offense Conduct

The state's evidence at trial established that in the early morning of November 30, 2002, Hoyle and another man approached Clifton Weithers, who was attempting to enter his apartment building at 1001 Eastern Parkway in Brooklyn. While Hoyle's accomplice pointed a gun at Weithers, Hoyle ripped off Weithers's gold chains and bracelets and took his cell phone. Hoyle was later arrested and indicted in New York Supreme Court, Kings County, on four charges: robbery in the first, second and third degrees and grand larceny in the fourth degree.

B.     The Procedural History

1.     The Trial Court Proceedings

a.     The Suppression Hearing

On June 4, 2004, a *Wade/Huntley*[1] hearing was held on Hoyle's motion to suppress the identification testimony and his oral statement.

At the hearing, Detective Thomas McKiernan testified that at approximately 10:00 a.m. on December 20, 2002, Weithers came to the 77th precinct to report that he had just seen, in front of a building at 1445 St. Johns Place, a man who had robbed him three weeks earlier.[2] H. 10, 31-32. Weithers told him that his sister, an off-duty police officer, was with him when he observed the man. H. 35. McKiernan, the detective assigned to the December 20

---

[1]     A *Wade* hearing is a pretrial hearing held to determine whether identification procedures were unduly suggestive. *See United States v. Wade*, 388 U.S. 218, 232 (1967) (holding that a post-indictment lineup is a critical stage requiring counsel's presence). A *Huntley* hearing addresses whether the government has established, beyond a reasonable doubt, that a statement was voluntarily made. *See People v. Huntley*, 204 N.E.2d 179, 183 (N.Y. 1965).

[2]     Throughout this opinion, "H." refers to the Suppression Hearing transcript and "Tr." refers to the Trial transcript.

robbery, drove Weithers back to where he had seen the robber to canvass the area, but they were unable to locate him. H. 31-32. McKiernan and Weithers returned to the precinct where McKiernan arranged a computer-generated photo array of persons affiliated with the 1445 St. Johns Place address. H. 11, 32-33. McKiernan showed Hoyle an array of six photographs. Weithers identified Hoyle from the array and signed his name under Hoyle's picture. H. 13.

Hoyle was arrested on January 4, 2003, at 10:45 p.m. and brought to the 77th precinct.[3] McKiernan interviewed him in a precinct squad room at 11:35 p.m. H. 21. Hoyle was not handcuffed for the interview and was permitted to use the bathroom and to get a drink of water. H. 21-22. Prior to speaking with Hoyle, McKiernan read him his *Miranda* rights from a card. H. 22. Hoyle indicated that he understood his rights by circling "yes" on the card and signing his name. H. 23. Hoyle then waived his rights and made an oral statement about the events on December 20 when Weithers and his sister-in-law saw him. McKiernan described the statement as follows:

> [Hoyle] told me that he went to the check cashing place looking for somebody he knows as cigarette man. He said when he looked inside … the dude was looking at [him]. He walked to the corner store and the guy followed him, and he got a cigarette. And when he came out he said to him, why you looking at me. Then a car pulled up and a girl came up to me and showed me a badge. They were talking that me and my man robbed him and they said I took a thousand dollars in jewelry.

H. 24.

At 1:15 p.m. the next day, January 5, 2003, McKiernan conducted a lineup that included Hoyle. H. 13, 36. McKiernan obtained five fillers from the Bedford Avenue Shelter based on a description of Hoyle. H. 14. McKiernan had written on his arrest sheet that Hoyle

---

[3] McKiernan testified that he frisked Hoyle after he placed him under arrest and found a magazine with bullets in it. H. 24-28. When he asked Hoyle about the location of the rest of the gun, Hoyle told him that he had thrown the other half on the roof. *Id.* At sidebar, the prosecutor informed the court and defense counsel that the People did not intend to offer the statement about the gun in their direct case at trial. H. 29-30.

was about five feet four inches, weighed 140 pounds and was 18 years old. H. 36-37. Hoyle weighed the least of all the participants in the lineup and was also the youngest. H. 37-38. Three of the fillers were over 30 years old and one was almost 20 years older than Hoyle and approximately 50 pounds heavier. The two fillers who were closest to Hoyle's age were 25 and both were over six feet tall. H. 38-39. McKiernan explained that seats one, two and three were adjusted to compensate for the height differences. H. 40-42. Each person was given a baseball hat to wear to help them look similar. H. 17-18. Hoyle chose seat number three in the lineup. H. 17.

While the lineup was being set up, Weithers waited in a back room. He could not see the fillers or Hoyle before the lineup. H. 15-17. When Weithers viewed the lineup he identified Hoyle, in seat number three, as the person who had robbed him. H. 18. McKiernan took photographs of the lineup, which were admitted into evidence at the hearing. H. 19-20.

The defense did not present any evidence at the suppression hearing. H. 43.

On June 7, 2004, the court denied Hoyle's motion to suppress, holding that the police-arranged lineup was fair and that the procedures were not unduly suggestive. The court noted that while "there were differences in weight, age and skin tone among the participants in the lineup, none of the differences served to single out the defendant in any way." Def. Opp., Ex. B. at 68. In addition, the court denied the motion to suppress Hoyle's post-arrest statement, holding that the statement was made after Hoyle had received *Miranda* warnings and had waived his rights to remain silent and to counsel. *Id*. at 66-68.

b.     *The Trial*

At trial, Weithers testified that in the early morning of November 30, 2002, he noticed Hoyle and another man laughing nearby as he walked home from an Eastern Parkway

bus stop after working a night shift at the Post Office. Tr. 48. Weithers started to walk faster because he felt nervous. As he approached his apartment building he got his keys out so that he could get inside quickly. When he got to the door and was about to insert the key, Weithers heard someone say, "Don't even try it." Tr. 53. Weithers turned around and saw Hoyle and another man, who was holding a gun, approaching him. Weithers saw both men's faces before the man with the gun instructed him to turn back around and face the door. Tr. 53-54.

While the other man put the gun in Weithers's side, Hoyle put his hand into Weithers's shirt and removed his necklaces. Hoyle then took Weithers' bracelets and cell phone. Tr. 56. When Weithers shifted his position, the gunman put the gun to his head and Hoyle told the gunman to shoot Weithers if he moved again. Tr. 58. While Hoyle was removing the jewelry, Weithers was able to see his face clearly in the light that was coming through the glass entrance door. Weithers was also able to see Hoyle's reflection in the glass door he was facing. Tr. 60. Weithers described the man who removed his jewelry as being shorter than 5'7'' and as having a "squatty" nose, braided hair and a lighter complexion than the gunman, who was also the taller of the two robbers. Tr. 58-60.

The gunman told Weithers not to move and to stay calm. Then Weithers heard the outer gate to the building swing closed. He turned and saw the two assailants running away down the street. Weithers started screaming and running after the men. He stopped at a payphone and called the police, who arrived soon thereafter. The police and Weithers canvassed the vicinity for the robbers but could not find them. Tr. 62-65.

Weithers testified that on December 20, 2002, he recognized Hoyle and the accomplice in front of a check cashing store. Weithers called his sister-in-law, Police Officer Denise Klass, who came to the location where Weithers was engaged in a conversation with

Hoyle. Klass was off-duty; she was not wearing her uniform and did not have her gun with her. When she arrived, she approached Hoyle, identified herself as a police officer and spoke to him. Tr. 71, 113-14. Klass convinced Weithers to accompany her to the 77th precinct, where he met with McKiernan. After McKiernan and Weithers canvassed the area without success, McKiernan conducted the identification procedures discussed above. Tr. 73, 75-76, 136.

The defense called Stanley Reed, the police officer who responded to the scene of the crime on November 30, 2002. Reed testified that Weithers had provided him with descriptions of the robbers: both were black and wore their hair in braids; one was about 5 feet 7 inches and one was about 5 feet 5 inches tall; and one had a light complexion while the other one had a darker complexion. Reed testified that Weithers told him that the lighter-skinned man was the gunman. Tr. 155-59.

Hoyle was convicted of robbery in the first degree on June 16, 2004. On August 4, 2004, Hoyle was sentenced to fifteen years in prison.

2.  *The Direct Appeal*

On appeal of his conviction to the New York Supreme Court, Appellate Division, Second Department, Hoyle argued through counsel that the trial court's instructions to the panel of prospective jurors during jury selection on witness credibility, identification and acting in concert violated N.Y. Crim. Proc. Law § 260.30.

By decision and order dated September 12, 2006, the Appellate Division, Second Department, affirmed the defendant's conviction. It held that Hoyle's argument was unpreserved for appellate review because the instructions were never objected to by Hoyle's counsel and that "[i]n any event, the instructions during voir dire were not improper." *People v. Hoyle*, 820 N.Y.S.2d 527 (2d Dep't 2006). By certificate dated December 27, 2006, the New York Court of

Appeals denied Hoyle's application for leave to appeal.  *People v. Hoyle*, 860 N.E.2d 996 (2006).

### 3. *Collateral Attacks*

#### a. *First § 440 Motion*

In a *pro se* motion dated January 3, 2007, Hoyle moved in the New York Supreme Court, Kings County, to vacate his judgment of conviction pursuant to N.Y. Crim. Proc. Law § 440.10, on the ground that he had not been legally sentenced because he had not been advised that he was subject to post-release supervision as part of his sentence of imprisonment.

In a decision and order dated July 6, 2007, the court denied the motion pursuant to N.Y. Crim. Proc. Law § 440.10(2)(d), which provides that the court must deny a motion to vacate a judgment when "[t]he ground or issue raised relates solely to the validity of the sentence and not to the validity of the conviction."  The court ordered Hoyle to be resentenced because, due to a "clerical error," the sentencing court had not imposed a term of post-release supervision at the time of sentence.  Def. Opp., Ex. E.  On August 9, 2007, the New York Supreme Court resentenced Hoyle to two and one-half years of post-release supervision, *nunc pro tunc* to the initial sentence date, August 4, 2004.

#### b. *Second § 440 Motion*

Hoyle moved a second time to vacate his judgment of conviction and to set aside his conviction in a *pro se* motion dated July 28, 2007.  Hoyle argued that the trial court improperly denied him a predicate offender hearing prior to sentencing him as a second felony offender, that he was arrested without probable cause and was denied counsel at the lineup, and that he was denied effective assistance of trial counsel.  Hoyle specified four way in which trial

counsel was allegedly ineffective: (1) counsel failed to object to the admission of lineup evidence; (2) counsel failed to object to the fact that Hoyle was charged with robbery in the first degree; (3) counsel failed to move for dismissal of the indictment pursuant to N.Y. Crim. Proc. Law § 30.30 (speedy trial); and (4) counsel failed to move for dismissal on the ground that Hoyle's guilt was not proved beyond a reasonable doubt and that the verdict was against the weight of the evidence. In the same motion, Hoyle also moved to vacate his judgments of conviction under two separate indictments that are not at issue here.

The New York Supreme Court denied Hoyle's motion in a decision and order dated January 16, 2008. The court held that Hoyle's claim that he had been improperly denied a predicate offender hearing prior to his adjudication as a second felony offender was "conclusively refuted by the sentencing minutes which show that the People did not file a predicate felony offender statement and [that] the court did not adjudicate defendant a predicate offender." Def. Opp., Ex. F - State Court decision at 5. With respect to the ineffective assistance of counsel claim, the court ruled that the denial of the motion was required pursuant to N.Y. Crim. Proc. Law § 440.10(2)(c), because the claim was based on matters in the record, which Hoyle unjustifiably failed to raise on direct appeal. *Id*. at 4-5.[4]

4. *The Instant Petition*

Hoyle filed the instant petition on November 24, 2008, claiming that he is entitled to a writ of habeas corpus under 28 U.S.C. § 2254 on three grounds: (1) he was denied effective assistance of trial counsel based on the trial counsel's failure to get a police report marked as an exhibit and entered into evidence; (2) he was unconstitutionally seized and searched and his

---

[4]     Hoyle's claims that he was denied counsel at lineup and was arrested without probable cause are not addressed in the state court's decision on the second collateral attack.

arrest was not based on probable cause; and (3) that he was denied due process because the lineup was unfair.

As discussed below, Hoyle's petition is denied because all of his claims are procedurally defaulted and without merit.

DISCUSSION

A.    *The Standard of Review*

    1.    *Exhaustion and Procedural Default*

28 U.S.C. § 2254(b) prevents a federal court from granting a petition for a writ of habeas corpus unless the petitioner has first exhausted all available state judicial remedies.  In order to have exhausted those remedies, a petitioner must have "fairly presented" his federal constitutional claims to the highest state court by apprising it of "both the factual and the legal premises of the claim he asserts in federal court."  *Daye v. Att'y Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*).  An unexhausted claim that can no longer be exhausted is deemed procedurally defaulted.  *See Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) ("[W]hen 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted."  (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991))).

A claim that has been procedurally defaulted in state court generally cannot be reviewed on the merits by a federal habeas court.  *See Harris v. Reed*, 489 U.S. 255, 260-62 (1989) (explaining rationale for habeas corpus procedural default rule); *see also Coleman*, 501 U.S. at 750 (noting a state's interest in "channeling the resolution of claims to the most appropriate forum, in finality, and in having an opportunity to correct its own errors").  However,

there are two circumstances in which a federal claim that has been procedurally defaulted -- or deemed procedurally defaulted due to the exhaustion requirement -- will nonetheless be reviewable on a federal petition for habeas corpus.

First, a petitioner is entitled to review of a procedurally defaulted claim if he can show "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750; *Teague v. Lane*, 489 U.S. 288, 298 (1989). A petitioner may establish cause by showing "that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials . . . made compliance impracticable." *Coleman*, 501 U.S. at 753 (internal quotation marks omitted). To show prejudice, a petitioner must demonstrate that the alleged error worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks omitted).

Second, if the petitioner is unable to show cause and prejudice, his procedural default may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to hear the claim on the merits, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). This ground for excusing procedural default should be applied only in "extraordinary" cases, as courts deem substantial claims of actual innocence "extremely rare." *Schlup*, 513 U.S. at 321-22.[5]

2.     *Review of State Court Adjudications on the Merits Under AEDPA*

_____

[5]     A procedural bar actually relied on by a state court to dispose of a claim may be found inadequate to prevent federal review on rare occasions where the state court applies the procedural bar in an "exorbitant" manner. *Lee v. Kemna*, 534 U.S. 362, 376 (2002); *see also Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003). This doctrine has no apparent application in a case in which an unexhausted claim is deemed procedurally defaulted, as that is a case in which by definition no state court has applied a procedural bar in any manner, exorbitant or otherwise.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. 28 U.S.C. § 2254(d). Under the AEDPA standard, the reviewing court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*[6]

The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413. "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

---

[6] This limited scope of review is often referred to as "AEDPA deference." *E.g., Jimenez v. Walker*, 458 F.3d 130, 135 & n.2 (2d Cir. 2006).

Under the "unreasonable application" standard set forth in *Williams*, "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist*, 260 F.3d at 93 (quoting *Williams*, 529 U.S. at 411). Interpreting *Williams,* the Second Circuit has added that although "'[s]ome increment of incorrectness beyond error is required … the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

AEDPA's limited scope of review applies whenever a state court disposes of a state prisoner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it refers to federal law in its decision. *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

B.    *Hoyle's Claims*

1.      *Ineffective Assistance of Trial Counsel*

Hoyle claims that he was denied the effective assistance of trial counsel based on his trial counsel's failure to have "police reports marked as exhibits to be entered into evidence." Habeas Corpus Petition ("H.C. Pet.") at 7. This particular claim of ineffectiveness was not raised on Hoyle's direct appeal. Nor was it among the ineffective assistance of counsel grounds listed in his second § 440 motion, all of which were rejected as procedurally barred pursuant to § 440.10(2)(c).[7] *See supra* B.3.b. This new aspect of Hoyle's ineffective assistance of counsel

---

[7]          N.Y. Crim. Proc. Law § 440.10(2)(c) prohibits relief on a claim that could have been raised on direct appeal. The statute mandates denial of a motion to vacate a judgment, when,

claim is therefore unexhausted. Because it can no longer be exhausted,[8] it is also deemed

procedurally defaulted. *See Aparicio*, 269 F.3d at 90. The claim fails because Hoyle is unable to

show cause for the default and prejudice resulting therefrom, or that a miscarriage of justice

would result if I do not review his claim. Finally, even though all allegations of ineffective

assistance should be reviewed together, because "ineffective assistance of counsel can turn on

the cumulative effect of all of counsel's actions," *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir.

1991), in this case this principle provides no comfort to Hoyle because his procedurally defaulted

claim of ineffective assistance of counsel is also without merit.

   The Supreme Court has established the following standard for claims of

ineffective assistance:

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment. Second, the
> defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable. Unless a defendant makes both showings, it
> cannot be said that the conviction … resulted from a breakdown in
> the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Thus, to make out this type of claim, the

petitioner must demonstrate both (1) that his attorney's performance "fell below an objective

standard of reasonableness," *id*. at 688, and (2) that "there is a reasonable probability that, but for

---

Although sufficient facts appear on the record of the proceedings underlying the judgment to have
permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon
the motion, no such appellate review or determination occurred owing to the defendant's
unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable
failure to raise such ground or issue upon an appeal actually perfected by him[.]
*Id.*

[8] The claim is procedurally barred now for the same reasons that Hoyle's second § 440 motion was
denied -- the asserted ground for ineffective assistance of counsel was based on matters on the record and thus could
have been raised on direct appeal. N.Y. Crim. Proc. Law § 440.10(2)(c) (barring collateral review if claim could
have been raised on direct review but was not).

counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

In assessing whether counsel's performance was deficient, judicial scrutiny "must be highly deferential," and the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted); *accord Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998); *see also Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*) ("[C]ounsel has wide latitude in deciding how best to represent a client. . . ."). The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct," *Wiggins*, 539 U.S. at 521, instead emphasizing that "'[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms,'" *id.* (quoting *Strickland*, 466 U.S. at 688), which requires "a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 689).

To establish the required "reasonable probability" that counsel's errors changed the outcome of the case, the petitioner must show not just "some conceivable effect," *Strickland*, 466 U.S. at 693-94, but rather "a probability sufficient to undermine confidence in the outcome," *id.* at 694. This determination, unlike the determination whether counsel's performance was deficient, may be made with the benefit of hindsight. *Lockhart v. Fretwell*, 506 U.S. 364, 371-73 (1993).

Hoyle's claim is meritless because his counsel tried to accomplish the very act he is being accused of failing to attempt. The police report Hoyle complains his counsel failed to

move into evidence is the police complaint report taken by Reed, who responded to Hoyle's 911 call on November 30, 2002. Reed testified that he wrote down Weithers's description of the perpetrators: two black males, the taller of whom was approximately 5'7'', had a lighter complexion, and carried the gun, and the shorter of whom had a darker complexion and took his jewelry. According to the record, Hoyle's counsel in fact moved (unsuccessfully) Reed's report into evidence on the ground that it established a prior inconsistent statement. Tr. 192, 200-01. Moreover, even though it was not received, Reed testified to the content of the report, and defense counsel was able to argue on summation that the evidence established an inconsistency. Thus, even though the document was not evidence, the relevant statements -- that Weithers had initially described the gunman, not the man who removed his jewelry, as having the lighter complexion -- were nonetheless part of the evidentiary record considered by the jury. Tr. 159. In addition, there is no merit to Hoyle's contention that the admissibility of the police report depended on it being deemed a business record or *Rosario* material.[9] Counsel's failure to successfully move the police report into evidence most certainly does not amount to deficient representation.

For the foregoing reasons, Hoyle's ineffective assistance claim fails.

    *2.    Fourth Amendment Claims*

Hoyle raises two fourth amendment grounds for habeas relief. First, he claims that he was convicted with evidence obtained pursuant to an unconstitutional search and seizure. Second, he argues that the police lacked probable cause to arrest him because the photo array was based on the location where Weithers recognized him, rather than the scene of the crime.

---

[9] The *Rosario* rule requires disclosure of certain statements of trial witnesses in advance of trial, but does not govern their admissibility. *See People v. Rosario*, 9 N.Y.2d 286, *cert. denied*, 368 U.S. 866 (1961). Under New York law, even if the report were deemed a business record, the court would nonetheless have had the discretion to reject its admission as cumulative. *See People v. Petty*, 7 N.Y.3d 277, 286-87 (2006).

Until now, Hoyle has never raised either of these claims -- not at his suppression hearing, in his direct appeal or in either collateral attack. These unexhausted claims are deemed exhausted because a state court would find them procedurally barred as claims that could have been raised on direct appeal but were not. *See* N.Y. Crim. Proc. Law § 440.10(2)(c); *Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994) ("[I]f the petitioner no longer has remedies available in the state courts under 28 U.S.C. § 2254(b), we deem the claims exhausted." (internal quotation marks omitted)). Hoyle's claims fail because he is unable to show cause for the default and prejudice resulting therefrom, or that a miscarriage of justice would result if I do not review his claims.

Moreover, because Hoyle was given the opportunity to fully and fairly litigate his Fourth Amendment claims at a pretrial suppression hearing, I cannot grant habeas relief on these grounds. A Fourth Amendment claim cannot be raised on habeas review when an "opportunity for full and fair litigation" has been provided in state court. *Stone v. Powell*, 428 U.S. 465, 482 (1976) ("[W]here the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." (emphasis added)). The Second Circuit has already determined that New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710 *et seq.*, is adequate. *See Capellan v. Riley*, 975 F.2d 67, 70, n.1 (2d Cir. 1992); *Taylor v. Kuhlmann*, 36 F. Supp. 2d 534, 549 (E.D.N.Y. 1999). Because "the focus of this standard is the word 'opportunity,'" the state need not do more than "make available 'a statutory mechanism' for suppression of evidence." *McPhail v. Warden*, 707 F.2d 67, 69 (2d Cir. 1983) (quoting *Gates v. Henderson*, 568 F.2d 830, 837 (2d Cir. 1977)).

The "litmus test" in the Second Circuit to determine whether a state prisoner has been denied an opportunity for full and fair litigation of his Fourth Amendment claims was set forth in *Gates*, which held that habeas review of such claims is allowed in only two circumstances: (1) if the state has provided no corrective procedures at all to redress the alleged violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process. *Capellan*, 975 F.2d at 70 (citing *Gates*, 568 F.2d at 840).

Hoyle was afforded the opportunity to litigate his Fourth Amendment claims at the *Wade/Huntley* pretrial hearing. His failure to previously raise the claims he brings for the first time in his habeas petition precludes me from reaching them. *See McPhail*, 707 F.2d at 70 (petitioner was precluded from litigating a Fourth Amendment claim in habeas petition where he had not raised it previously through available state procedure).

If I were to reach the merits of Hoyle's Fourth Amendment claims, I would find them to be without merit. Hoyle states that he was convicted with evidence obtained from an unconstitutional search and seizure. There is nothing in the record to suggest that the search of Hoyle was unconstitutional: it was conducted pursuant to a lawful arrest based on an identification by Weithers. The claim that the ammunition seized from him at the time of his arrest contributed to his conviction is patently false. Although it is true that Hoyle was charged at arrest with possession of ammunition, he was neither indicted for it nor did the People seek to admit at trial evidence of the possession of the bullets or his statement concerning the discarding of the gun. Hoyle's argument that the police lacked probable cause to arrest him because the photo array was based on photos of individuals linked to the address where Weithers later

recognized him, is also without merit. There is nothing constitutionally troubling about the officers' conduct or the photo array under these circumstances.

3.    *Denial of Due Process Because Lineup Was Unfair*

Hoyle also seeks habeas relief on the ground that the lineup violated his due process rights because it was unduly suggestive. I am precluded from reviewing this claim because it too is unexhausted and procedurally barred from habeas review. *See Aparicio v. Artuz*, 269 F.3d at 90. Hoyle never appealed the court's ruling in the suppression hearing, which found that the lineup procedure was not unduly suggestive. Resp. Br., Ex. A at 67. Having failed to raise this issue on direct appeal, a state court would now find Hoyle's claim procedurally barred pursuant to N.Y. Crim. Proc. Law § 440.10(2)(c). *See supra* n.7. Hoyle's claim fails because he is unable to show cause for the default and prejudice resulting therefrom, or that a miscarriage of justice would result if I do not review it. In any event, Hoyle's claim lacks merit because the hearing court's decision is not contrary to, or an unreasonable application of, clearly established federal law.

If pretrial identification procedures are impermissibly suggestive, due process requires the exclusion of the identification testimony unless its reliability is established through independent evidence. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *see also Stovall v. Denno*, 388 U.S. 293, 301-02 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987) (holding that the court must determine from the totality of the circumstances whether identification "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law").

When a witness has made a pretrial identification, a challenge to that identification and to an in-court identification of the defendant at trial triggers "a one-step or

18

two-step inquiry." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990). The first step is to determine whether pretrial identification procedures were unnecessarily suggestive. *Id.* If they were not, the challenge is denied, and the reliability of the identification is a question only for the jury. *See Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir. 1986). If the procedures were unnecessarily suggestive, the second step is to determine whether the identification testimony is nevertheless admissible because it is "independently reliable rather than the product of the earlier suggestive procedures." *Maldonado-Rivera*, 922 F.2d at 973.

In determining the degree of suggestiveness of a lineup -- universally regarded as the least questionable of the various identification procedures -- the Second Circuit has held that "the 'principal question' … is whether the appearance 'of the accused, matching descriptions given by the witness,'" so stood out from the other participants as to suggest to the witness that the suspect was the culprit. *United States v. Wong*, 40 F.3d 1347, 1359-60 (2d Cir. 1994) (quoting *Jarrett*, 802 F.2d at 41) (emphasis omitted).

Unnecessary suggestiveness in identification procedures does not, standing alone, amount to a violation of due process. Rather, "[t]he linchpin for admissibility of identification testimony is reliability." *Maldonado-Rivera*, 922 F.2d at 973 (citing *Manson*, 432 U.S. at 106-7, n. 9). Unless, "'under all the circumstances of th[e] case, there is a very substantial likelihood of irreparable misidentification,' the presence of some element of untrustworthiness goes only to the identification's weight, not to its admissibility." *Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir. 1998) (quoting *Manson*, 432 U.S. at 116).

The factors to consider in determining whether identification testimony is independently reliable include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the

criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). These factors should be analyzed in light of the totality of the circumstances, *see Neil*, 409 U.S. at 199, and all need not weigh in favor of the government in order for a challenged identification to be admissible. Where the interval between the crime and viewing the array is longer than desirable, that factor may be outweighed by the other indicia of reliability. *See, e.g.*, *Wong*, 40 F.3d at 1360 (ten-month gap before identification out-weighed by witness's opportunity to observe gunman for two or three seconds before ducking under table out of fear that she would be shot); *United States v. Jacobowitz*, 877 F.2d 162, 168 (2d Cir. 1989) (noting that 10-month delay was outweighed by other factors demonstrating strong reliability).

At the *Wade* hearing, McKiernan testified about the lineup procedures and Hoyle's attorney cross-examined him. The hearing court concluded that the procedure was proper and not unduly suggestive. H. 67-68. The court noted that "differences in hair style and height among the participants were disguised" and "While there were differences in weight, age and skin tone, … none of the differences served to single out the defendant in any way." H. 68. I see no reason to question that finding. Although lineups that unnecessarily contrast the height of a suspect with that of the other participants have been condemned as suggestive, *see, e.g.*, *Foster v. California*, 394 U.S. 440, 442-43 (1969), I do not consider the discrepancy in height to have been suggestive in this case, especially in light of the fact that the participants were all seated, three in chairs that were adjusted to compensate for any height differences.

In any event, Hoyle's claim still fails because the record amply demonstrates the independent reliability of Weithers's identification. Weithers first observed the robbers when he turned around while trying to open the door to his building in response to one of them saying;

"Don't even try it." Tr. 54. Weithers was able to see the men's faces even though the first encounter lasted only a "split second." Tr. 54. He also "got a good chance to look at [Hoyle]" as he removed his jewelry. Tr. 57-58, 61. In addition, Weithers noted that he could see Hoyle's reflection in the glass door. Tr. 60-61. He described the lighting conditions as "very bright" even though it was night because of the light coming through the glass entry door. Tr. 52-53. Given these circumstances as well as the short interval of time between the crime and the identification, I find that the *Bigger* factors support the independent reliability of Weithers's identification. Accordingly, I cannot conclude that the admission at trial of those identifications was contrary to, or constituted an unreasonable application of, federal law.

## CONCLUSION

For the foregoing reasons, the petition is denied. As Hoyle has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So ordered.


John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
        April 3, 2009